IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRELL HUNTER,<br><br>        Plaintiff,<br><br>    v.<br><br>CITY AND COUNTY OF SAN FRANCISCO, et al.,<br><br>        Defendants. | Case No. 11-4911 JSC<br><br>**REDACTED ORDER RE: DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (Dkt. No. 31)** |

    Now pending before the Court is the remainder of Defendants' Motion for Partial Summary Judgment (Dkt. No. 31). The Court previously granted the motion in part, denied it in part, and deferred it in part pursuant to Federal Rule of Civil Procedure 56(d). (Dkt. No. 59.) Plaintiff has since completed the requested discovery and the parties have filed supplemental briefing. (Dkt. Nos. 88 & 102.) After carefully considering the pleadings and evidence submitted by the parties, and having had the benefit of oral argument on February 28, 2013, the Court DENIES the remainder of Defendants' motion for partial summary judgment in part and GRANTS it in part.

## SUMMARY JUDGMENT EVIDENCE

On December 7, 2010, Plaintiff Darrell Hunter ("Hunter") was arrested at his mother's house by San Francisco Police Officers Davies and Gumpfer and taken to the San Francisco County Jail. While seated in the triage area of the jail Plaintiff was questioned by a nurse while these two officers and other Sheriff's deputies stood around him. Plaintiff "felt that [the nurse] was being rude in the way he was asking questions" and asked the nurse "can you talk to me better than that." (Dkt. No. 32-1, 117:18-19; 119:6.) An altercation ensued wherein Plaintiff was punched in the head by Defendant Burleson and fell to the ground. (Dkt. No. 54-5,149:5-150:24). Once on the ground, Plaintiff was punched in the head and handcuffed. (Dkt. No. 54-5, 150:12-18; 154:3-18.) Plaintiff recalls that the handcuffs were yanked up and down and his face was shoved into the ground. (Dkt. No. 54-5, 155:14-156:22.) Plaintiff was then taken to be photographed and ultimately a holding cell. Much of this incident was recorded by a video camera within the jail intake area. When he left the jail, Plaintiff went to California Pacific Hospital. He was diagnosed with wrist sprains of the left and right wrists and a mild concussion.

Immediately after the incident, Plaintiff filed a Citizen's Complaint alleging excessive force with the San Francisco Sheriff's Department. (Dkt. No. 54-8, D000053.) Deputy Chew conducted the initial investigation of Hunter's complaint, and on February 18, 2011, he completed his administrative case review and concluded that the case should be "forward[ed] to the Undersheriff for review and/or action as deemed appropriate by the Sheriff's Department Administration." (Dkt. No. 54-8, at D000042.) Defendants Burleson and Reymundo were identified as subjects of this investigation.[1] (*Id.*)

On April 15, 2011, Freya Horne, Assistant Legal Counsel for the Office of the Sheriff, issued Defendant Burleson a Notice of Intent to Impose Suspension for up to Five (5) Days Without Pay ("Notice"). (Dkt. No. 104-3.) The Notice finds that "[w]hile Hunter remained

---

[1] The record does not indicate what happened thereafter with respect to the investigation of Defendant Reymundo. In his deposition, he testified that he did not recall receiving any notice of how the investigation was resolved and he did not have a Skelly hearing. (Dkt. No. 104-15.)

2

1  seated with at least seven deputies standing behind him, you grabbed his arm with your left
2  hand and hit Hunter in the face with your right hand although he was not physically
3  threatening to you." (*Id*. at p. 1.) The Notice states that "[y]our use of force with an inmate
4  seated in a chair and surrounded by seven or eight deputies who was not physically
5  threatening to you was abusive and demonstrated a clear violation of the Use of Force Policy
6  and your training as a deputy sheriff." (*Id*. at p. 2.)

   A month later, Defendant Burleson had a Skelly hearing before Defendant Hennessey, the Sheriff at that time. (Dkt No. 110-1, 87:8-9.) That same day, Hennessey sent Burleson a letter resolving the pending disciplinary charges, stating that "I have determined that you did not violate any policies and therefore I am not imposing discipline. Any record of this will be removed from your personnel file." (Dkt. No. 104-4.) Four months later, Plaintiff received a letter stating that Undersheriff J. Dempsey had reviewed the case and concluded that the allegations against the Sheriff's staff could not be sustained. (Dkt. No. 54-10.)

   No charges were ever filed against Plaintiff for the charge for which he was arrested – interfering with a process server.[2]

## THE PRIOR SUMMARY JUDGMENT ORDER

Plaintiff's Amended Complaint names eleven defendants and alleges eleven causes of action. Defendants moved for summary judgment on most, but not all, of Plaintiff's claims. On October 10, 2012, the Court granted the motion as to (1) Plaintiff's claims for deliberate indifference to medical needs (Second and Seventh Causes of Action); (2) Plaintiff's neglect of duty claim (Tenth Cause of Action)[3] as to all Defendants; (3) Plaintiff's Bane Act claim (Fifth Cause of Action) as to all Defendants except for Deputy Burleson and the City and County; and (4) Plaintiff's theory of respondeat superior liability on any federal claims. (Dkt. No. 59.) The Court continued the motion as to Plaintiff's *Monell* claims (including the Section 1983 excessive force claim (First Cause of Action), failure to train (Eleventh Cause

---

[2] The record does not include any evidentiary support for this fact, although both sides reference it in their briefs.
[3] The Amended Complaint erroneously identifies this cause of action as the "Ninth Cause of Action," but it is in fact the Tenth Cause of Action.

3

of Action)), the Unruh claim (Fifth Cause of Action), and the due process claim (Ninth Cause of Action) to allow Plaintiff to conduct additional discovery pursuant to Federal Rule of Civil Procedure 56(d). The Court also continued the motion as to Plaintiff's claims against San Francisco Police Officers Davies and Gumpfer, and Supervisors Senior Deputy Nuti and Sergeant Roja pursuant to Rule 56(d).

## MOTION FOR PARTIAL SUMMARY JUDGMENT

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is "material" only if it could affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The question is "whether a jury could reasonably find either that the [moving party] proved his case by the quality and quantity of evidence required by the governing law or that he did not." *Id.* "[A]ll justifiable inferences must be drawn in [the nonmovant's] favor." *See United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989) (en banc) (internal citations omitted).

The moving party bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, interrogatory answers, admissions and affidavits, if any, that it contends demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party opposing the motion may not rest upon the mere allegations or denials of [that] party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *See* Fed. R. Civ. P. 56(e); *see also Anderson*, 477 U.S. at 250. The opposing party need not show the issue will be resolved conclusively in its favor, but rather, must submit sufficient evidence to create a material factual dispute, thereby requiring a jury or judge to resolve the parties' differing versions at trial. *See Anderson*, 477 U.S. at 248–49.

4

Special rules of construction apply to evaluating summary judgment motions: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n.*, 809 F.2d 626, 630 (9th Cir. 1987).

## DISCUSSION

### A. Plaintiff's *Monell* Claims

In *Monell v. Department of Social Services*, 436 U.S. 658, 690–91 (1978), the Supreme Court held that municipalities are "persons" subject to liability under § 1983 where "action pursuant to official municipal policy of some nature cause[s] a constitutional tort." Plaintiff makes *Monell* claims against the City and County in connection with his section 1983 claims for the excessive force, and deliberate indifference to medical needs claims (the medical needs claim is no longer at issue).[4] Under *Monell*, while a city may not be held vicariously liable only for the unconstitutional acts of its employees on the basis of an employer-employee relationship with the tortfeasor, it may be held liable when a municipal policy causes an employee to violate another's constitutional right. *Monell*, 436 U.S. at 691–92.

Municipal liability under *Monell* may be established in any of three ways: (1) "the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity;" (2) "the plaintiff may establish that the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an act of official governmental policy;" or (3) "the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992).

---

[4] Plaintiff has abandoned his *Monell* claims based on failure to train, the Unruh Act and the due process claim.

5

Plaintiff focuses on the Sheriff Department's internal affairs investigation as demonstrating ratification of unconstitutional conduct. The Sherriff Department issued a Notice of Intent to Discipline to Defendant Burleson stating that "[y]our use of force with an inmate seated in a chair and surrounded by seven or eight deputies who was not physically threatening to you was abusive and demonstrated a clear violation of the Use of Force Policy and your training as a deputy sheriff." (Dkt. No. 104-3 at p. 2.) Former Sheriff Hennessey then presided over a Skelly hearing for Burleson and concluded that no discipline should be imposed. (Dkt. No. 104-4.) Sheriff Hennessey was unable to recall whether he viewed the videotape of the incident prior to rendering his decision, although he testified that he did not believe he reviewed it before the hearing or during the hearing.[5] On summary judgment, the Court must determine whether a reasonable juror could conclude that former Sheriff Hennessey's conduct in this regard ratified a subordinate's unconstitutional decision or action and the basis for it.

A municipality can be liable for an isolated constitutional violation if the final policymaker "ratified" a subordinate's actions. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). "[W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Id.*

In *Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991), for example, the Ninth Circuit considered whether a jury verdict finding Los Angeles Police Department ("LAPD")

---

[5] *See, e.g.*, (Dkt. No. 110-1, 39:7-11 (Q: "did you review the video" A: "I don't recall. I don't believe so. I may have. I may have reviewed the video after the hearing"); 40:15-22 ("It's unlikely that I reviewed it at the disciplinary hearing. It's more likely, that if I reviewed the video, I reviewed it after the disciplinary hearing"); 50:28-9 ("I just don't personally recall sitting there, looking at a video"); 135:1- 137:15 (multiple questions regarding whether viewing the video refreshed his recollection as to having seen it before; answer: no); 142:2-4 ("[a]s I said, I may have viewed the video, but I thought the analysis provided to me [by Burleson's attorney] on the video was determinative").

Chief Daryl Gates liable in his individual and official capacity for the constitutional violations of six of his officers (and thus *Monell* liability for the City) was plain error. As here, the plaintiffs filed a civilian complaint following the incident of alleged excessive force. The complaint was investigated by the Community Resources Against Street Hoodlums ("CRASH") division—the same division that carried out the search of plaintiffs' home which gave rise to the underlying incident— rather than Internal Affairs. *Id*. at 635. Chief Gates ultimately sent plaintiffs a letter informing them that none of their complaints could be sustained. *Id*. Plaintiffs' expert, a former New York City police officer and qualified expert regarding proper police procedures and policies, testified that "the investigation contained a lot of holes and left questions unanswered that should have been visible to any reasonable police administrator… and since both Internal Affairs and Gates did not question it, but instead ratified it, the investigation procedure must be deemed to have been carried out in accordance with official policy." *Id*. (internal quotations omitted). The court stated that "evidence that [Police] Chief Gates, an authorized policymaker on police matters, made, or ratified a decision that deprived plaintiffs of their constitutional rights would suffice for official liability under *Pembaur*." *Id*. at 646 (*citing Pembaur v. City of Cincinnati*, 475 U.S. 469, 481(1986).) The court found that the jury's verdict was not plain error where the evidence showed that rather than disciplining the individual officers involved in the excessive force incident and establishing new procedures to prevent similar incidents in the future, Chief Gates signed a letter informing the plaintiff that none of the complaints would be sustained thereby ratifying the investigation which suggested a policy or custom of resorting to the use of excessive force. *Id*. 646-47.

Similarly, in *Gillette v. Delmore*, 979 F.2d 1342 (9th Cir. 1992), the Ninth Circuit considered whether *Monell* liability existed where the chief policymaker declined to overrule a subordinate's discretionary decision to fire the plaintiff in violation of his constitutional rights. The court observed that under the Supreme Court's decisions in *Pembaur* and *Praprotnik*, to prove ratification a plaintiff had to show either that "an official policymaker ma[d]e a deliberate choice from among various alternatives to follow a particular course of

7

1 action" or "that that a policymaker approve[d] a subordinate's decision *and the basis for it*
2 before the policymaker will be deemed to have ratified the subordinate's discretionary
3 decision." *Id*. at 1348 (internal citations omitted, emphasis in original). Indeed, a solitary
4 decision by a municipal policymaker "may be sufficient to trigger section 1983 liability under
5 *Monell*, even though the decision is not intended to govern future situations," but the plaintiff
6 must show that the triggering decision was the product of a "conscious, affirmative choice" to
7 ratify the conduct in question. *Gillette*, 979 F.2d at 1347 (internal citation omitted).

8 Here, a rational juror could find that Sherriff Hennessey made a deliberate choice to
9 condone Deputy Burleson's conduct. First, there is no dispute that Hennessey was the chief
10 policymaker and no dispute that he made the final decision not to impose discipline. Second,
11 Assistant Legal Counsel Freya Horne of the Sheriff's Department proposed that discipline be
12 imposed based at least in part on her review of the videotape of the incident. Third, a rational
13 juror could find that Sherriff Hennessey did *not* review the videotape of the incident before
14 deciding not to impose discipline. These facts support a finding that Sherriff Hennessey
15 made a conscious, affirmative choice to ratify Deputy Burleson's conduct: Hennessey
16 rejected his legal counsel's proposal to impose discipline without even reviewing the
17 videotape upon which the proposal was based.

18 Defendants argue that the videotape is subject to more than one interpretation, and in
19 fact, after reviewing the videotape at his deposition Hennessey testified that it did not suggest
20 excessive force. (Dkt. No. 110-1, 142:15-21.) However, on summary judgment the Court
21 draws all inferences in favor of the non-moving party and "the only question is whether a
22 rational juror could infer a noninnocent explanation. *Christie v. Iopa*, 176 F.3d 1231, 1240
23 (9th Cir. 1999). The Court has reviewed the videotape of the incident. A reasonable juror
24 could certainly infer—as did Assistant Legal Counsel Horne— that the video established that
25 Burleson used excessive force against Plaintiff.

26 Additional evidence offered by Plaintiff further supports *Monell* liability. Four of the
27 eight defendants had prior complaints of excessive force (although none of the complaints
28 were sustained) and evidence that of the 300 excessive force complaints filed between 2006-

8

2010, 92 were forwarded the Undersheriff or Sheriff by Internal Affairs ("IA") for further review, and of those, only 7 were sustained and resulted in discipline.[6] (Dkt. Nos. 104-1 & 104-2.) Defendants argue that this evidence only shows that someone filed a complaint and the Sheriff's Department found it without merit. While this may be true, this evidence must be considered in the context of former Sheriff Hennessey's testimony as a whole.

In particular, although Hennessey testified that one of the primary purposes behind placing the cameras within the jail is to deter inappropriate conduct by staff, no Sheriff official routinely reviews the videotapes, not even when a complaint is made. Indeed, Hennessey himself testified that he only reviews videos in the context of a Skelly hearing 60 percent of the time. (Dkt. No. 110-1, 65:6-16.) Further, Hennessey testified that he preferred to keep "disciplinary hearings [ ] reasonably informal" because he "thought it was friendlier" and he preferred for the hearings to "go faster" because he "had a busy day." (Dkt. No. 110-1, 27:18-21, 131:11-15.)   These facts suggest a policy of condoning excessive force: the Sherriff's busy schedule, and desire to keep disciplinary hearings friendly, was more important than actually reviewing the contemporaneous evidence of the incident behind the excessive force complaint, even when the Sherriff's own legal staff suggested that a deputy committed excessive force.

Moreover, Hennessey also testified that "it was inconclusive that Deputy Burleson had, in fact, slugged or hit Mr. Hunter," although on the record before the Court the videotape clearly shows Burleson hitting Mr. Hunter in the head. (Dkt No. 110-1, 49:9-11.) Further, after reviewing the videotape during his deposition, Hennessey testified that it did not reflect "excessive use of force, It was sort of a routine part-of-business use of force" which did not need to be documented under the Department's Use of Force Policy. (*Id.* at 142:15-21.) This "routine part-of-business use of force" testimony may fare no better than Chief Gates' comments condoning the officers' conduct in *Larez*.  946 F.2d at 645 (stating "we can hardly think of better evidence" than statements Chief Gates made after incident that were consistent

---

[6] Defendant ▉▉▉▉▉ has been the subject of two excessive force complaints including one that Undersheriff Dempsey forwarded for further review, although no discipline was ultimately imposed. (Dkt. Nos. 104-8; 104-15, 147:1-10.)

with plaintiffs' claims of excessive force).  In addition, the Department's Use of force Policy requires all employees to report "(1) use of any physical force whenever an injury occurs" and "(2) In the event of no injury, a deputy must still report the use of force particularly to document a disciplinary problem and seek applicable sanctions." (Dkt. No. 104-11 at p. 3.) It is undisputed that no one reported the use of force against Plaintiff.

Accordingly, the Court denies Defendants' motion for summary judgment on Plaintiff's *Monell* claims against the City and County in connection with his section 1983 claims for the excessive force.

### B. Plaintiff's Claims Against Officers Davies and Gumpfer

Plaintiff alleges that the two San Francisco Police Officer defendants, Officer Davies and Officer Gumpfer, did not physically engage in excessive force against him; instead, Plaintiff contends they are liable because they stood by and did nothing. "While officers may be liable for willfully refusing to act in the face of ongoing assaults by fellow officers upon a custodial detainee, the bystanding officers' duty to protect arises only when the officers are aware of a specific risk of harm to the plaintiff and has time and opportunity to intervene." *Mathis v. Williams*, 1998 WL 101746, at *3 (N.D. Cal. Feb. 24, 1998) (*citing United States v. Reese*, 2 F.3d 870, 888–90 (9th Cir.1993); *Ting v. United States*, 927 F.2d 1504 (9th Cir. 1991)).  At Plaintiff's request, the Court continued the motion for summary judgment on this claim to allow Plaintiff the opportunity to depose Defendants Davies and Gumpfer.

In his supplemental brief, Plaintiff has failed to present evidence that either Davies or Gumpfer witnessed Burleson hit Plaintiff or that they had time to intervene to the extent that they may have observed the altercation.  Plaintiff provides a single page of Gumpfer's deposition wherein he describes seeing "a whole bunch of movement on the ground," he heard a deputy say "stop resisting" while the "deputies were on top of him trying to, trying to place cuffs on him." (Dkt. No. 105-13, 65:6-13.)   There is no evidence regarding where Gumpfer was standing at this time, whether he observed Burleson strike Plaintiff, or whether there was any opportunity for him to intervene once he observed the deputies attempting to handcuff Plaintiff.  While there is slightly more evidence offered regarding Davies' location

10

at the time of the incident—he was "five or six feet" away from Plaintiff and he had a good view of him while Plaintiff was seated, but not "once he went to the ground"— there is similarly no evidence as to whether he observed Burleson strike Plaintiff or whether he had an opportunity to intervene. (Dkt. No. 105-14, 52:4-10.)  Plaintiff provides two non-consecutive pages of Davies' deposition, although the second page (Dkt. No. 105-14, 57:3) begins with the question "Why?" and response "because the deputies had him in control" it is not the Court's obligation to fill in the blanks and speculate as to what question this statement was in response to.  *See Keenan v. Allan*, 91 F.3d 1275, 1278 (9th Cir. 1996) (it is not the court's task "to scour the record in search of a genuine issue of triable fact").

Plaintiff has thus failed to "demonstrat[e] that these officers had an opportunity to intervene and prevent or curtail the violation (e.g., enough time to observe what was happening and intervene to stop it), but failed to do so." *Dennison v. Lane*, No. 07-0778, 2013 WL 432935, at *4 (N.D. Cal. Feb. 4, 2013) *citing Robins v. Meecham*, 60 F.3d 1436, 1442 (9th Cir.1995).  Accordingly, Defendants' motion for summary judgment as the claims against Defendants Davies and Gumpfer is granted.

## C. Claims Against Supervisors Nuti and Roja

Plaintiff also makes claims against two supervisors, Senior Deputy Nuti and Sergeant Roja, who were present at the incident but did not themselves use force against Plaintiff.  A supervisor may be held liable under Section 1983 for "1) their own culpable action or inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is made; or 3) for conduct that showed a reckless or callous indifference to the rights of others." *Edgerly v. City and County of San Francisco*, 599 F.3d 946, 961 (9th Cir. 2010) (internal quotations and citations omitted).  A supervisor's failure to intervene and bring his subordinates under control may, under some circumstances, support liability under Section 1983.  *Lolli v. County of Orange*, 351 F.3d 410, 418 (9th Cir. 2003).  At Plaintiff's request, the Court continued the motion for summary judgment on this claim to allow Plaintiff the opportunity to depose Defendants Roja and Nuti.

1    Sergeant Roja testified that at the time of the incident he was in his office which was
2    20-25 feet away from where Plaintiff was seated and that he did not see Plaintiff until he
3    heard a commotion and looked out to see Plaintiff on the ground.  (Dkt. No. 105-9, 51:2-20;
4    53:6-16.)  Based on this evidence and drawing all inferences in Plaintiff's favor, a reasonable
5    trier of fact could not conclude that Roja failed to exercise control of the subordinate deputies
6    when he was not even aware of anything happening until after Plaintiff was already on the
7    ground and he was in an office at least 20 feet away.

    In contrast, Senior Deputy Nuti testified that he appears on the video in the right side
of the screen and although he was seated behind the counter, he could "see Mr. Hunter from
that position and the triage area from that position." (Dkt. Nos. 105-10, 134:1-3; 112-1,
135:3-4.)  He was watching Plaintiff's interview with the intake nurse and observed
Defendant Burleson "make contact" with Plaintiff.  (Dkt. No.112-1, 137:3-9.)  Although Nuti
viewed the video during his deposition, he denied that it showed Burleson punching or
striking Plaintiff in the head.  (*Id*. at 138:12-20.)  Based on this evidence, a reasonable trier of
fact could find that Nuti was aware of what was going on prior to the incident and failed to
exercise control over the subordinate deputies to prevent the incident from happening.

    Accordingly, Defendants' motion for summary judgment as to the claims against
Sergeant Roja is granted, but it is denied as to the claims against Senior Deputy Nuti.

### D. **Plaintiff's Claim under California Civil Code § 51.7**

    Under California Civil Code section 51.7 an individual has the "right to be free from
violence, or intimidation by threat of violence" committed because – as relevant to this case –
of the individual's race, color, ancestry, or national origin. *See* Cal. Civil Code §§ 51.7, 51(b).
The Court's prior Order noted that Plaintiff had not offered any evidence that this incident
was based on his race, but granted Plaintiff's Rule 56(d) request to allow him to review the
defendant officer personnel records to determine whether there was additional circumstantial
evidence to support this claim.

    Plaintiff's supplemental opposition renews his argument that racial animus may be
shown circumstantially and in support of this claim he recites statistics suggesting that of the

complaints that were forwarded by IA to the Undersheriff, 49 of the 73 complainants were African American which he contends comes from the City's Access Database records at Exhibit 2 to the Elford Declaration. However, the Court has reviewed Exhibit 2 and cannot identify any information regarding the race of the complainants. (Dkt. No. 105-2.) Accordingly, in light of the absence of any evidence suggesting that this particular incident was based on Plaintiff's race, Defendants' motion for summary judgment on the California Civil Code § 51.7 claim is granted.

## CONCLUSION

For the reasons explained above, Defendants' motion for partial summary judgment is denied in part and granted in part as follows:

1. Defendants' motion for summary judgment on the *Monell* excessive force claim is DENIED.
2. Defendants' motion for summary judgment as to the claims against Officers Davies and Gumpfer is GRANTED.
3. Defendants' motion for summary judgment as to the claims for supervisory liability (the Eleventh Cause of Action) is GRANTED as to Sergeant Roja and DENIED as to Senior Deputy Nuti.
4. Defendants' motion for summary judgment as to Plaintiff's claim under California Civil Code § 51.7 claim (the Sixth Cause of Action) is GRANTED.

This Order disposes of Docket No. 31.

**IT IS SO ORDERED.**

Dated: March 4, 2013

                                                                          _____
JACQUELINE SCOTT CORLEY
UNITED STATES MAGISTRATE JUDGE