IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRELL HUNTER,<br><br>        Plaintiff,<br><br>   v.<br><br>CITY AND COUNTY OF SAN FRANCISCO, et al.,<br><br>        Defendants. | Case No. C11-4911 JSC<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR NEW TRIAL (Dkt. No. 221)** |

Plaintiff Darrell Hunter filed this action alleging violation of his civil rights under state and federal law by certain individual San Francisco Sheriff's Deputies, Undersheriff Jan Dempsey, former Sheriff Michael Hennessey, and the City and County of San Francisco ("the City and County"). Following a one-week trial on Plaintiff's claims of excessive force against the individual Sheriff's deputies, the jury returned a verdict in favor of Defendants. Now pending before the Court is Plaintiff's Motion for a New Trial (Dkt. No. 221). Having considered the parties' submissions, and having had the benefit of oral argument on October 31, 2013, the Court DENIES Plaintiff's motion.

**BACKGROUND**

Plaintiff filed this suit alleging violation of his civil rights under state and federal law following an incident that occurred while he was at San Francisco County Jail One on December 7, 2010. Plaintiff alleged that while he was seated in the triage area of the jail responding to questions from the intake nurse, the individual defendants, Deputies Gonzales, James, Reymundo, and Lu, began to gather around him and Defendant Deputy Burleson ("Burleson") struck him in the head at which point Plaintiff fell to the ground. Plaintiff alleged that the deputies used excessive force to handcuff him and return him to his seat, and thereafter, to transport him to a holding cell. Defendant Senior Deputy Nuti was alleged to have observed the incident, but to have failed to exercise control over the subordinate deputies to prevent the incident from occurring.

Plaintiff filed a Citizen's Complaint with the San Francisco Sheriff's Department alleging excessive force. The complaint was investigated by Internal Affairs ("IA") which concluded that the complaint should be forwarded to the Undersheriff for review and/or action as deemed appropriate by the Sheriff's Department Administration as to Defendants Burleson and Reymundo. On April 15, 2011, Freya Horne, Assistant Legal Counsel for the Office of the Sheriff, issued Defendant Burleson a Notice of Intent to Impose Suspension for up to Five (5) Days Without Pay ("Notice").[1] (Dkt. No. 104-3.) The Notice finds that "[w]hile Hunter remained seated with at least seven deputies standing behind him, you grabbed his arm with your left hand and hit Hunter in the face with your right hand although he was not physically threatening to you." (*Id*. at p. 1.) The Notice states that "[y]our use of force with an inmate seated in a chair and surrounded by seven or eight deputies who was not physically threatening to you was abusive and demonstrated a clear violation of the Use of Force Policy and your training as a deputy sheriff." (*Id*. at p. 2.) Former Sheriff Hennessey subsequently decided not to impose any discipline on Burleson after a Skelly hearing and

---

[1] It is unclear what happened thereafter with respect to the investigation of Defendant Reymundo. In his deposition, he testified that he did not recall receiving any notice of how the investigation was resolved and he did not have a Skelly hearing. (Dkt. No. 104-15.)

2

likely without viewing a videotape of the incident. (Dkt. No. 126 n.5.) Based on this and other evidence, the Court denied summary judgment on Plaintiff's *Monell* claims, but bifurcated the individual liability portion of the trial from the *Monell* claims. (Dkt. Nos. 126 & 162.)

During phase one of the trial, Plaintiff and each of the individual defendants testified, as did police practices' experts for each side. The experts took conflicting views on the reasonableness of the force used under hypothetical situations identical to that presented here. The jury was also repeatedly shown a videotape of the incident captured by video surveillance in the intake area. The jury returned a verdict in favor of the individual defendants finding that Plaintiff had not proven that any of the individual defendants had used excessive force. The verdict ended the trial prior to presentation of Plaintiff's *Monell* claims against the City and County as a finding of a constitutional violation is a predicate to *Monell* liability. The Court thereafter entered judgment in Defendants' favor and the underlying motion for a new trial followed.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 59, a court has the discretion to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). The Ninth Circuit has held that the grounds on which a new trial may be granted include, but are not limited to: (1) a verdict that is contrary to the weight of the evidence; (2) a verdict that is based on false or perjurious evidence; or (3) to prevent a miscarriage of justice. *Molski v. M.J. Cable, Inc*., 481 F.3d 724, 729 (9th Cir. 2007) (citation and quotation omitted). In undertaking this review, the Court may weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party. *See Landes Construction Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987). However, a "jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is possible to draw a contrary conclusion." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2007). Thus, "the court is not justified in granting a new trial merely

1  because it might have come to a different result from that reached by the jury." *Roy v.*
2  *Volkswagen of Am., Inc*., 896 F.2d 1174, 1176 (9th Cir. 1990) (internal quotation marks and
3  citation omitted).

## DISCUSSION

Plaintiff contends that he is entitled to a new trial on three grounds: (1) the verdict on the Fourth Amendment excessive force claims was against the weight of the evidence; (2) the verdict was a miscarriage of justice; and (3) the verdict was based on perjurious testimony. At oral argument, Plaintiff concentrated on the first and second grounds arguing that the jury's finding of no excessive force was against the weight of the evidence and constituted a miscarriage of justice. In particular, Plaintiff focused on evidence regarding the disciplinary proceedings which followed the December 7, 2010 incident which the Court excluded from the phase one portion of the trial. While Plaintiff does not argue that the Court erred in excluding this evidence from phase one, Plaintiff argues that the Court, having the benefit of knowledge of this evidence, should conclude that the jury's verdict was against the weight of the totality of evidence (albeit evidence that was not presented to them) and represents a miscarriage of justice.

### A. Whether the Verdict was Against the Weight of the Evidence

In considering a Rule 59 motion, the district court has "the duty ... to weigh the evidence as [the court] saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in [the court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence." *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990) (internal citation omitted). Here, Plaintiff contends that the jury's verdict on the excessive force claim is against the weight of the evidence because the force used by the deputies, particularly Burleson and Reymundo, is excessive under any standard.

"Whether an individual has been subjected to excessive force under the Fourth Amendment requires consideration of the reasonableness standard set forth in *Graham v. Connor*, 490 U.S. 386, 395 [](1989)," which "balance[s] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing

4

1 governmental interests at stake." *Luchtel v. Hagemann*, 623 F.3d 975, 980 (9th Cir. 2010)
2 (internal quotations omitted).  The reasonableness inquiry looks at "whether the officers'
3 actions are objectively reasonable in light of the facts and circumstances confronting them."
4 *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (internal quotations omitted).  "The
5 question is not simply whether the force was necessary to accomplish a legitimate police
6 objective; it is whether the force used was reasonable in light of *all* the relevant
7 circumstances." *Hammer v. Gross*, 932 F.2d 842, 846 (9th Cir. 1991) (emphasis in original).

8      The trial evidence included the following.  On December 7, 2010, Plaintiff was
9 arrested and taken to San Francisco County Jail Number One for processing.  The incident
10 occurred while Plaintiff was seated in a chair being screened by a nurse in the intake area.
11 All the deputy Defendants testified that during this time Plaintiff was raising his voice, using
12 profanity, and gesturing with his hands.  The deputies' characterization of this behavior
13 ranged from "loud [and] profane" (Burleson TR 15:6-9) to "aggressive" (Gonzales TR 94:10-
14 20) to "verbally abusive" (Nuti TR 25:9-26:4; James TR 100:5-101:4) to "passively resistant"
15 (Reymundo TR 10:3-9).   Plaintiff testified that he was passively sitting, responding to the
16 nurse's questions without using profanity or raising his voice. (Dkt. No. 211, Hunter TR
17 14:12-15.)

18      Burleson, the first deputy to make physical contact with Plaintiff, testified that he was
19 the Director Post for the jail on the night in question: he was responsible for maintaining the
20 front of the jail, filling out the Field Arrest Cards, and ensuring that every custody was
21 medically triaged.  (Dkt. 213, Burleson TR 5:11-18.)   At the time Plaintiff was seated in the
22 intake area, Burleson was standing nearby talking with the other deputies in the area.  Shortly
23 after Plaintiff sat down, Burleson approached Plaintiff and pointed a finger in his face and
24 said something, although Burleson did not recall what he said.  Plaintiff testified that
25 Burleson said "Shut up.  This is our house.  You do what we tell you to do."  (Dkt. No. 211,
26 Hunter TR 14:1-5.)  The other deputy Defendants then began to gather around Plaintiff in a
27 show of command presence.  Burleson testified that shortly thereafter he decided to handcuff
28 Plaintiff for the safety of the other deputies, civilians, and himself because Plaintiff was not

following orders to stop yelling and cursing at the nurse. (Dkt. 213, Burleson TR 41:11-14.) Burleson therefore made physical contact with Plaintiff by placing his left hand on Plaintiff's left wrist and "attempted to put [it] behind his back and push him forward." (*Id*. at 19:10-19.) Burleson denied touching Plaintiff in the head. (*Id*. at 19:21-22, 121:21-122:4.) Plaintiff testified that Burleson struck him in the side of the head. (Dkt. No. 211, Hunter TR 17:25-18:4.) Plaintiff then fell or was placed on the ground and the other deputies gathered over him. Once he was handcuffed, he was placed back in the chair. The deputy Defendants testified consistently that they did not recall Burleson striking Plaintiff in the head; however, every Defendant save one (Senior Deputy Nuti) conceded that what occurred involved a use of force which was not formally documented. (Burleson TR 27:18-28:3; Reymundo TR 32:4-6, 37:11-15; James TR 86:23-25, 99:13-25; Lu TR 149:3-5, 180:10-15; Gonzales TR 101:2-6.)

The parties' respective police practices' experts offered conflicting testimony regarding the reasonableness of using force on a seated detainee. Plaintiff's expert Timothy Williams testified that it would violate the San Francisco Sheriff's Department's use of force policy to strike a seated detainee in the head who was refusing to answer questions, waving his arms, crossing his legs, and twisting around in his seat to look at a deputy behind him. (Williams TR 193:20-194:2.) In contrast, Defendants' expert Don Cameron testified that it is consistent with an officer's training to strike a seated detainee in the head under the following circumstances: if he is large (six-foot-four, 250-pounds), agitated, irate, speaking loudly and with profanity, and not obeying basic orders to keep his hands in his lap. (Cameron TR 31:11-33:4.) In fact, Mr. Cameron characterized a detainee exhibiting such behavior as an "active resistor" under the Peace Officer Standards and Training ("POST") Materials, Learning Domain 20, which is the training guideline with respect to use of force for all California law enforcement officers. (Cameron TR 22:7-23:4; Trial Ex. 23.) According to Mr. Cameron, Burleson would thus have been authorized to use force up to and including personal weapons. (Cameron TR 24:19-25:12.)

6

Finally, the jury was repeatedly shown a videotape of the incident which captured the activities taking place in the entire booking area.  Although the videotape of the incident is not of high quality, it shows Burleson quickly approaching Plaintiff, placing his left hand on Plaintiff's left wrist, and then making contact with Plaintiff's head at which point Plaintiff goes to the ground and the other deputy Defendants gather over him.

The jury considered all this evidence, including the videotape, and concluded that Plaintiff had not established by a preponderance of the evidence that the force used by the deputies under these circumstances was unreasonable.  Plaintiff contends that the jury's finding was against the weight of the evidence because the videotape shows Burleson hitting Plaintiff in the head.  Although the Court agrees that the videotape shows Burleson making contact with Plaintiff's head, this conclusion does not mandate a finding that the jury's verdict was against the clear weight of the evidence.  The jury could have concluded that Burleson did in fact strike Plaintiff in the head, but that this contact either occurred inadvertently as he was trying to handcuff Plaintiff, or the use of force was reasonable to restrain a verbally aggressive detainee in accordance with the testimony of Defendants' police practices expert, Mr. Cameron.

At oral argument, Plaintiff argued that Mr. Cameron's testimony was rebutted by the letter of Freya Horne, the Sheriff's legal counsel, which concluded that Burleson's "use of force with an inmate seated in a chair and surrounded by seven or eight deputies who was not physically threatening to you was abusive and demonstrated a clear violation of the Use of Force Policy and your training as a deputy sheriff." (Dkt. No. 104-3, p. 2.)   This evidence was not presented to the jury during the phase one proceedings, but was presented to the Court with the motion for summary judgment and thus is part of the larger evidentiary record of the case.  The letter, however, has limited probative value to rebut Mr. Cameron's testimony as Ms. Horne was never deposed, and she was not subject to cross-examination regarding what training she was referring to or otherwise able to provide context for the conclusion she reached in the letter.

7

Thus, while the letter may contradict Mr. Cameron's testimony, it is the only evidence Plaintiff identifies that does so.  At trial Plaintiff did not challenge Mr. Cameron's conclusion that Plaintiff was an "active resistor" or that it would be consistent with an officer's training to strike a seated detainee under the same circumstances presented here.  This is the crux of the problem—even if the Court were to consider the letter, Plaintiff did not challenge Mr. Cameron's expert opinion that the actions taken by Burleson here were in accordance with his training which lies at the heart of the reasonable officer standard in an excessive force case.  For the Court to nonetheless conclude that the force used was unreasonable would substitute the Court's judgment for that of the jury which is expressly prohibited.  *See Beckway v. DeShong*, No. 07-5072, 2012 WL 1355744, at *4 (N.D. Cal. Apr. 18, 2012) ("On the question of reasonable force, then, the Court must acknowledge that the jury was presented with competing expert witnesses, and, again, it would be inappropriate for the Court to substitute its own view for the conclusions reached by the jury after hearing all the competing evidence.").  Rather, "[t]aking the entirety of the testimony and evidence into account, the Court concludes that this case is one which another reasonable jury might have decided differently from this jury or in which the Court sitting as a bench trial might have reached a different conclusion[, but] it is not "quite clear that the jury has reached a seriously erroneous result" given the evidence that was presented at trial.  *Carrethers v. Bay Area Rapid Transit*, No. 09-1101, 2012 WL 1004847, at *2 (N.D. Cal. Mar. 26, 2012).

**B. Whether the Verdict Represents a Miscarriage of Justice**

Plaintiff contends that if the jury's verdict is allowed to stand it would represent a miscarriage of justice because Plaintiff presented evidence that (1) Defendant Burleson did in fact hit Plaintiff in the head, and (2) Defendant former Sheriff Hennessey ratified this conduct without even bothering to review the videotape of the incident.  Defendants counter that the jury's verdict is in fact consistent with the finding of former Sheriff Hennessey that Defendant Burleson did not commit excessive force, and as such, does not amount to a miscarriage of justice.

As with Plaintiff's argument that the jury's verdict is against the clear weight of the evidence, it is not enough for the Court to say that it would have decided the matter differently. Thus, while the videotape does appear to show Defendant Burleson striking Plaintiff in the head and the Court found on summary judgment that there was sufficient evidence of ratification on the part of Defendant Hennessey to let the *Monell* claims go forward, this does not establish a miscarriage of justice. The cases cited by Plaintiff do not suggest otherwise.

In *Ruffin v. Fuller*, 125 F. Supp. 2d 105 (S.D.N.Y. 2000), the court granted a new trial based on (1) the judge's conviction that the plaintiff had in fact been kicked in the mouth during the incident in question, (2) doubts regarding the truthfulness of the testimony of the officers involved in the incident, and (3) because of issues surrounding a videotape of the incident. Plaintiff, an inmate at the Sullivan Correctional Facility who was housed in the Special Housing Unit, alleged that a struggle ensued while he was being escorted from his cell to the shower by three corrections officers and that while he was lying on the floor inside or near his cell one of the officers repeatedly kicked him the mouth. *Id*. at 106. Much of the incident was captured on video surveillance; however, the video did not show what happened when the plaintiff was on the ground or when he was returned to his cell. *Id.* at 107-08. Further, the videotape was "heavily edited" by a correction's officer and, according to plaintiff's expert, 15 minutes of footage was missing from one of the cameras. *Id*. at 107. The officers all testified that they were not sure how plaintiff's injuries occurred, but their testimony was contradicted by the video surveillance in significant parts as well as by the expert medical testimony which indicated that the injuries to the plaintiff's teeth were caused by kicking or punching. *Id*. at 108-10. The court concluded that "the officers' testimony strained the bounds of credulity. Examining all the evidence presented at trial, including to some extent the credibility of the witnesses, it is clear the jury's verdict was against the weight of the evidence." The court also focused on the fact that the evidence "indicated that a critical portion of the surveillance tape made by the camera outside Ruffin's cell was destroyed." *Id*. at 110.

9

Here, in contrast, the events precipitating and initiating the underlying incident are all captured on video. While that video is of less than ideal quality, it nonetheless shows sufficient detail for the jury to have been able to view the incident and draw their own conclusions about what it showed and evaluate the objective evidence against the deputies' testimony regarding the events. As the court noted in *Ruffin*, "reconciling inconsistent versions of events naturally involves an assessment of credibility." *Id*. at 110. The court there rejected defendants' arguments that the officers' testimony was either not truly inconsistent with the videotape or immaterial because "the corrections officers' testimony strained the bounds of credulity." Here, even were the Court to conclude that Burleson's testimony that he did not strike Plaintiff in the head likewise strained the bounds of credulity, the jury's verdict would still not represent a miscarriage of justice, because as discussed above, the jury could have found that Burleson was lying but still concluded based on the testimony of Defendants' expert that he was entitled to use force to handcuff Plaintiff under the circumstances.

The court's decision in *Busch ex rel. Estate of Busch v. City of New York*, 224 F.R.D. 81 (E.D.N.Y. 2004), is similarly distinguishable. There, the court concluded that it would be a miscarriage of justice to let the jury's verdict stand because "[a]lthough Defendants presented testimony that Busch lunged or charged towards the officers prior to being shot, abundant testimonial evidence exists that lends serious doubt to the credibility of some of the police officers' and [one of the civilian witnesses'] testimony." *Id*. at 95; *see also Jennings v. Jones*, 587 F.3d 430 (1st Cir. 2009) (finding that the district court did not abuse its discretion in ordering a new trial after it weighed the testimony of the two witnesses who claimed to have observed the incident against the objective evidence (a videotape of the incident) and found that in light of the contradictions between the two the witnesses were not credible). Here, the issue is not simply a matter of credibility; rather, the jury could well have found that

1    Burleson's testimony, and even that of the other deputy Defendants was not credible, and still
2    returned a verdict in Defendants' favor based on the testimony of Mr. Cameron.[2]
3           With respect to the internal affairs investigation and former Sheriff Hennessey's
4    conduct following the incident, although troubling, the alleged ratification is not legally
5    cognizable absent a showing that there was an underlying constitutional violation; here, that
6    the deputies used excessive force against Plaintiff.  In *Monell v. Department of Social*
7    *Services*, 436 U.S. 658, 690–91 (1978), the Supreme Court held that municipalities are
8    "persons" subject to liability under § 1983 where "action pursuant to official municipal policy
9    of some nature cause[s] a constitutional tort."  Plaintiff's *Monell* theory was premised on a
10   theory that former Sheriff Hennessey, the "official with final policy-making authority[,]
11   ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v.*
12   *Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992).  While there was sufficient evidence in
13   support of this claim to present it to the jury, the jury's conclusion that there was no
14   constitutional violation necessarily rendered Plaintiff's *Monell* claims moot.

15      C. **The Alleged Perjury of the Deputy Defendants**
16          Plaintiff's final argument, that the verdict was based on perjured testimony, is likewise
17   unavailing.  Plaintiff contends that the deputy Defendants and the two San Francisco police
18   officers present during the incident committed perjury by denying that Burleson struck
19   Plaintiff in the head and in stating that Plaintiff attempted to stand up while he was seated in
20   the intake area.  In particular, Plaintiff focuses on Defendant Burleson's testimony that he did
21   not touch Plaintiff in the head despite the videotape which shows Burleson making contact

---

[2] The remainder of the cases cited by Plaintiff are at the summary judgment stage and are thus inapplicable to the question of whether the jury's verdict on the excessive force claim represents a miscarriage of justice.  *See, e.g.*, *Headwaters Forest Def. v. Cnty. of Humboldt*, 276 F.3d 1125 (9th Cir. 2002) (reversing the district court's grant of summary judgment based on qualified immunity following remand from the United States Supreme Court); *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001) (reversing the district court's grant of summary judgment for the defendant on the excessive force claim); *Nelson v. City of Davis*, 709 F. Supp. 2d 978 (E.D. Cal. 2010) aff'd, 685 F.3d 867 (9th Cir. 2012) (concluding that a "fact issue remained as to whether force employed by officers was reasonable.").

with Plaintiff's head. Plaintiff likewise contends that the videotape shows Defendant Reymundo hitting Plaintiff in the head which Reymundo denied. Finally, Plaintiff contends that Defendants Reymundo, Nuti and Gonzales as well as the two San Francisco police officer witnesses all committed perjury when they testified that Plaintiff stood up or attempted to stand up immediately prior to the incident as this is belied by the videotape of the incident.

Although Defendant Burleson's testimony stands in stark contrast to the video evidence, the jury had the opportunity to weigh the credibility of his testimony. The Court disagrees that the video is equally clear-cut with respect to Defendant Reymundo's testimony. Nonetheless, as discussed *supra*, the jury may well have found Burleson and even Reymundo not credible, but still concluded that based on the essentially unchallenged testimony of Defendants' expert that the use of force was reasonable. With respect to the testimony of the other deputy Defendants, the testimony that Plaintiff stood up or attempted to stand up was not given at trial; instead, the deputies made the statement in their IA interviews. At trial, the deputies agreed that Plaintiff did not stand up. Further, to the extent that the video evidence may contradict Burleson or any of the other Defendants' testimony, the jury was charged with evaluating the testimony of all the witnesses. This includes Plaintiff's credibility as his testimony that he did not swear, raise his voice, or speak in anything other than a calm manner is contradicted by the testimony of the Defendants and the percipient witnesses present at the time.

"[I]t is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses." *Roy v. Volkswagen of Am., Inc*., 896 F.2d 1174, 1179 opinion amended on denial of reh'g, 920 F.2d 618 (9th Cir. 1990) (internal citation and quotation omitted); *see also Nicholson v. Rushen*, 767 F.2d 1426, 1427 (9th Cir. 1985) (plaintiff's assertions that witnesses committed perjury do not entitle him to a new trial as "the credibility of witnesses and the weight of the evidence are issues for the jury" to decide). Where credibility is central to a jury's determination, "[d]oubts about the correctness of the verdict are not sufficient grounds for a

new trial: the trial court must have a firm conviction that the jury has made a mistake." *Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir.1987) (internal citation and quotation omitted).

## CONCLUSION

"Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Tennant v. Peoria & Pekin Union Ry.*, 321 U.S. 29, 35 (1944). Accordingly, the Court denies Plaintiff's Motion for New Trial.

This Order disposes of Docket No. 221.

**IT IS SO ORDERED.**

Dated: November 19, 2013

JACQUELINE SCOTT CORLEY
UNITED STATES MAGISTRATE JUDGE

13